******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JEFFREY WILLIAMS *v.* COMMISSIONER
OF CORRECTION
(AC 39049)

Sheldon, Mullins and Sullivan, Js.

*Syllabus*

The petitioner sought a writ of habeas corpus, claiming, inter alia, that his
trial counsel provided ineffective assistance by failing to challenge the
state's medical evidence by consulting and calling as a witness a medical
expert with experience evaluating medical evidence in child sexual
abuse cases to rebut certain testimony offered by the state's expert
witness, M. The habeas court rendered judgment denying the petition,
from which the petitioner, on the granting of certification, appealed to
this court. *Held*:

1. The habeas court properly rejected the petitioner's claim that his trial
   counsel was ineffective in failing to consult and call a rebuttal medical
   expert witness: the record did not reveal any definitive finding by the
   habeas court that trial counsel failed to consult with a medical expert
   in preparation for the medical testimony of M, and because nothing in the
   habeas court's subordinate factual findings or in the evidence adduced
   at the habeas trial required, as a matter of law, the conclusion that trial
   counsel did not consult with an expert prior to cross-examining M, this
   court would not assume the existence of such a fact on appeal; moreover,
   the habeas court properly concluded that the petitioner had failed to
   show that his trial counsel was deficient in failing to present testimony
   from an expert witness to rebut M's testimony, as there was nothing in
   the record that prior to trial, the petitioner's trial counsel knew about
   an expert who disagreed with M's opinion, trial counsel was not required
   to track down each and every potential witness lead, and it as not for
   this court to second-guess trial counsel's strategy for confronting M.

2. The petitioner could not prevail on his claim that the habeas court improp-
   erly determined that he had failed to prove that his trial counsel per-
   formed deficiently by failing to present the testimony of a neurosurgeon
   who had performed back surgery on the petitioner to establish that the
   petitioner was incapable of physically or sexually abusing the victim,
   the petitioner having failed to rebut the presumption that trial counsel's
   decision not to pursue such a theory by calling that witness was based
   on reasonable professional judgment; that court found that trial counsel
   had discussed the potential defense of physical incapability with the
   petitioner but reasonably could have concluded that it was not an ade-
   quate defense to the charged crimes, that such a defense would not
   have been helpful because the jury was not likely to believe it, and that
   evidence regarding the petitioner's surgery and subsequent recovery
   would not have been helpful to the theory of defense at trial, which
   was that the victim had fabricated the allegations to avoid being returned
   to her mother's care.

Argued May 30—officially released October 17, 2017

*Procedural History*

Amended petition for a writ of habeas corpus,
brought to the Superior Court in the judicial district of
Tolland and tried to the court, *Oliver, J.*; judgment
denying the petition, from which the petitioner, on the
granting of certification, appealed to this court.
*Affirmed*.

*Michael W. Brown*, for the appellant (petitioner).

*Timothy J. Sugrue*, assistant state's attorney, with
whom, on the brief, were *Patrick J. Griffin*, state's
attorney, and *Rebecca A. Barry*, assistant state's attor-

ney, for the appellee (respondent).

*Opinion*

MULLINS, J. The petitioner, Jeffrey Williams, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. He claims that the court improperly concluded that he failed to prove that his trial attorney provided ineffective assistance of counsel by failing (1) to challenge the state's medical evidence by consulting and calling as a witness a medical expert with experience evaluating medical evidence in child sexual abuse cases, and (2) to present the testimony of John Strugar, a neurosurgeon, who performed back surgery on the petitioner in August, 1999. We affirm the judgment of the habeas court.

This court's decision in the petitioner's direct appeal sets forth the following relevant facts, which the jury in the petitioner's criminal trial reasonably could have found, and procedural history. "Between the spring of 1997 and mid-October, 1999, the victim[1] and her three younger sisters lived with their mother, who was the [petitioner's] girlfriend, her uncle and the [petitioner] at various residences in the city of New Haven. The victim was approximately eight years old when the [petitioner] began to abuse her. The [petitioner] beat her about once a week for a variety of reasons. In November, 1997, the [petitioner] knocked the victim to the floor, causing a spiral fracture of her left humerus. The victim was taken to a hospital, but her mother instructed her and her sisters to attribute the injury to the victim's having fallen off her bed. On another occasion, the [petitioner] banged the victim's head on a sink, breaking one of her teeth. When the victim told her mother of the broken tooth, her mother instructed her to go outside and play. The [petitioner] struck the victim with a wooden paddle and on one occasion gave her a black eye. The victim's mother put makeup on the bruise to cover it. The victim's teacher, however, noticed the makeup and bruise. At another time, the school personnel discovered a hickey on the victim's neck. The victim had told her mother that the [petitioner] had given her the hickey. The [petitioner] convinced her mother that someone else had given the victim a hickey and then beat the victim.

"Sometime between August and October, 1999, the [petitioner] placed the victim in a situation that was likely to injure her health. When the victim did not comply with the [petitioner's] instructions, he made her put her head out a window and then he poured water over her head. He made her stay there until it was time to go to school.

"At night, the [petitioner] would awaken the victim and take her to his room where he told her to rub his back.[2] Initially, the [petitioner] lay face down but would turn over and instruct the victim to rub his lower body. The [petitioner] took the victim's hand and placed it

on his penis, at first outside of his boxer shorts and then inside. The [petitioner's] sexual abuse progressed beyond back-rubs and having the victim touch his penis. The [petitioner] began to grope the victim's vagina, buttocks, thighs and undeveloped chest. On three or four occasions, the [petitioner] forced his penis into the victim's vagina.[3] If the victim asked the [petitioner] to stop, he would tell her not to tell him what to do. The victim bled after the first and second rapes and told her mother, who told her she was having her menstrual period. Although the victim reported the abuse to her grandfather, he refused to believe her. Consequently, the victim did not report the continuing abuse for fear that no one would believe her. The victim eventually disclosed the [petitioner's] sexual abuse to her cousin but implored her not to tell anyone.

"In early 2001, the victim, her sisters and mother moved to a homeless shelter in Waterbury, after which the victim and her sisters were removed from their mother's custody by the department of children and families (department). The victim was placed in a foster home. While the victim and her foster mother were watching a television movie about sexual abuse, the victim ran from the room crying. Because the victim was so overcome with emotion, her foster mother waited until the next day to discuss the subject with her. During the conversation, the victim confided that the [petitioner] had raped her and hurt her private parts. The foster mother reported the complaint to a department social worker.

"Subsequently, the victim was interviewed by a forensic specialist, examined by a pediatric nurse practitioner [Judith Moskal-Kanz, who also served as a forensic medical examiner for child sexual abuse and child abuse] and interviewed by a detective, Michael Hunter. [Moskal-Kanz] found a furrow running through the victim's hymen, an injury consistent with penile penetration. Hunter also interviewed the [petitioner] and recorded his statement. According to the [petitioner], subsequent to his having back surgery, he slept in a hospital bed in the living room where he awoke one night to find the victim stroking his penis. The [petitioner] so informed the victim's mother, who beat the victim. One month later, the [petitioner] again awoke and found the victim fondling his penis. He again reported the incident to the victim's mother who administered 'a whupping.' In his statement, the [petitioner] acknowledged having spanked the victim but denied that he ever punched her, hit her, broke her arm or had sexual intercourse with her.

"The [petitioner] was arrested and charged on December 5, 2002. The state filed a twelve count long form information. The theory of defense was that the victim lied about the abuse to avoid being returned to the care of her mother." (Footnotes in original.) *State*

v. *Williams*, 102 Conn. App. 168, 170–73, 181, 926 A.2d 7, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007). As part of its case-in-chief, "the state called . . . Moskal-Kanz . . . as a witness. Moskal-Kanz testified . . . that scarring on the victim's hymen was consistent with penile penetration and consistent with the victim's description of the intercourse the defendant had forced on her." Id., 181.

The jury found the petitioner guilty of all counts charged, namely, two counts of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1), seven counts of risk of injury to a child in violation of General Statutes (Rev. to 1997 and 1999) §§ 53-21 (1) and (2), and three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2). Id., 170. The petitioner was sentenced to thirty-five years imprisonment. Id. This court upheld his conviction on direct appeal. Id., 209.

The petitioner filed an amended petition for a writ of habeas corpus on May 13, 2015. Relevant to this appeal, the petitioner alleged that his trial attorney, Michael Moscowitz, rendered ineffective assistance of counsel by (1) failing to consult with and call as a witness a medical expert with experience evaluating medical evidence in child sexual abuse cases for the purpose of refuting Moskal-Kanz' testimony that her colposcopic examination of the victim revealed trauma to the victim's hymen consistent with sexual abuse, and (2) failing to present testimony from Strugar regarding the petitioner's August, 1999 back surgery and subsequent incapacitation.

Following a three day trial, the habeas court issued a memorandum of decision on March 3, 2016, denying the petition for a writ of habeas corpus. As to both alleged bases for ineffective assistance, the habeas court found that the petitioner had failed to meet his burden of demonstrating that Moscowitz' performance was objectively unreasonable. Following a grant of a petition for certification to appeal, this appeal followed. Additional facts and procedural history will be set forth where necessary.

As a preliminary matter, we set forth our standard of review and the applicable legal principles. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . ." (Internal quotation marks omitted.) *Thomas* v. *Commissioner of Correc-*

*tion*, 141 Conn. App. 465, 470, 62 A.3d 534, cert. denied, 308 Conn. 939, 66 A.3d 881 (2013).

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Although a petitioner can succeed only if he satisfies both prongs, a reviewing court can find against a petitioner on either ground." (Citations omitted; internal quotation marks omitted.) *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 668–69, 159 A.3d 1112 (2017).

"[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland* v. *Washington*, supra, 466 U.S. 688. "[J]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 679, 51 A.3d 948 (2012).

"[E]ffective assistance of counsel imposes an obligation [on] the attorney to investigate all surrounding circumstances of the case and to explore all avenues that may potentially lead to facts relevant to the defense of the case." (Internal quotation marks omitted.) Id., 680. "Nevertheless, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable

decision that makes particular investigations unnecessary." (Internal quotation marks omitted.) Id.

"The reasonableness of an investigation must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it." *State* v. *Talton*, 197 Conn. 280, 297–98, 497 A.2d 35 (1985). Trial counsel "need not track down each and every lead or personally investigate every evidentiary possibility before choosing a defense and developing it. . . ." (Internal quotation marks omitted.) *Ricks* v. *Commissioner of Correction*, 98 Conn. App. 497, 502, 909 A.2d 567 (2006), cert. denied, 281 Conn. 907, 916 A.2d 49 (2007). Accordingly, the habeas court cannot second-guess trial counsel's decision not to investigate or call certain witnesses when "counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . ." *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681–82.

Mindful of these principles, we turn to the petitioner's claims on appeal.

I

The petitioner first claims that the habeas court improperly determined that he failed to prove that Moscowitz rendered ineffective assistance by failing to consult with—and, ultimately, call as a witness—a medical expert in order to challenge Moskal-Kanz' testimony that her colposcopic examination of the victim revealed injuries consistent with sexual abuse. We disagree.

The following additional facts are relevant to this claim. As previously set forth, Moskal-Kanz testified at the petitioner's criminal trial that her colposcopic examination of the victim revealed scarring or furrowing on the victim's hymen consistent with sexual abuse. *State* v. *Williams*, supra, 102 Conn. App. 181. At the petitioner's habeas trial, Jennifer Canter, a child abuse pediatrician, testified that she had examined the victim's colposcopy photographs and determined, contrary to Moskal-Kanz, that the victim had an "absolutely normal exam," a "normal" hymen that exhibited "no scar or furrowing," and that there was "no affirmative evidence of laceration."

The habeas court, however, found that the petitioner failed to demonstrate that Moscowitz performed deficiently by failing to consult or call as a witness an expert for purposes of challenging Moskal-Kanz' testimony at the petitioner's criminal trial. The habeas court stated: "Regarding the sexual abuse and medical findings [of Moskal-Kanz], [Moscowitz] testified credibly to consulting with medical experts in practically every case he has tried with medical findings of trauma, although he could not specifically recall consulting with a medical expert in this case. [Moscowitz] had access to all of the relevant medical information in the case as part

of the discovery process. He testified credibly that if, in his consultation with a medical expert, the consultant opined that the findings were 'normal,' he would either have the witness take the stand in his case-in-chief or use the information to cross-examine the state's witness." Accordingly, the habeas court found: "It is clear . . . that . . . Moscowitz' performance in . . . either relying on his experience and/or consulting with a medical expert was not objectively unreasonable or constitutionally deficient. It would be the very definition of the kind of second-guessing disfavored in the law to allow the petitioner to substitute both the strategic judgments and the newly discovered medical expert [Canter] . . . for that of [Moscowitz]."

The petitioner claims that the habeas court improperly concluded that he failed to demonstrate that Moscowitz performed deficiently by "failing to consult with and present [as a witness] a medical expert" to challenge Moskal-Kanz' testimony. We disagree.

The petitioner's claim on appeal is based largely upon a mischaracterization of the record. He grounds his claim that Moscowitz performed deficiently on the factual assertion that Moscowitz "fail[ed] to consult with . . . a medical expert" and took Moskal-Kanz' testimony "at face value." Our review of the habeas court's memorandum of decision, however, does not reveal any finding that Moscowitz failed to consult with a medical expert in preparation for Moskal-Kanz' testimony. It, instead, reveals that the habeas court credited Moscowitz' testimony that, although he consulted with medical experts in "practically every case" he has tried in which the state presented medical evidence trauma, he could not recall specifically whether he used one to assess Moskal-Kanz' testimony that the victim's hymen exhibited signs of sexual abuse. Indeed, the habeas court found that Moscowitz was not deficient for "*either* relying on his experience *and/or* consulting with a medical expert," indicating that it had not made a definitive finding as to whether Moscowitz consulted an expert in the petitioner's case, as opposed to relying on his own experience cross-examining the state's medical witnesses in other cases. (Emphasis added.) Accordingly, the petitioner's claim that Moscowitz performed deficiently by failing to consult with an expert in preparation for Moskal-Kanz' testimony must fail because there is no factual basis for it in the record.[4]

It appears that the petitioner attempts to avoid this fatal gap in the record by two methods. First, he asserts that "[r]easonable inferences to be drawn from the record indicate that [Moscowitz] did not consult with a medical expert in preparing for the petitioner's criminal trial." It is well settled, however, that "it is not the function of this court . . . to make factual findings . . . . Conclusions of fact may be drawn on appeal only where the subordinate facts found [by the trial court]

make such a conclusion *inevitable as a matter of law
. . .* or where the undisputed facts or uncontroverted
evidence and testimony in the record make the factual
conclusion *so obvious as to be inherent in the trial
court's decision.*" (Emphasis added; internal quotation
marks omitted.) *State* v. *Shashaty*, 251 Conn. 768, 783,
742 A.2d 786 (1999), cert. denied, 529 U.S. 1094, 120 S.
Ct. 1734, 146 L. Ed. 2d 653 (2000). Nothing either in the
habeas court's subordinate factual findings or in the
evidence adduced at the habeas trial *requires*, as a
matter of law, the conclusion that Moscowitz did not
consult with an expert prior to cross-examining Moskal-
Kanz. We, therefore, cannot assume the existence of
such a fact on appeal.[5]

Second, the petitioner argues in the alternative that,
even if the habeas court did not find that Moscowitz
*had not* consulted with an expert, it also did not find
that he *had*. Because, however, it is the petitioner's
burden to prove the factual basis for his ineffective
assistance claim; see *Gaines* v. *Commissioner of Cor-
rection*, supra, 306 Conn. 679; and not the respondent's
burden to prove a negative, the fact that the habeas
court did not find that Moscowitz consulted an expert
does not help the petitioner. There was no evidence
adduced at the habeas trial affirmatively establishing
that Moscowitz did not consult an expert. That Moscow-
itz could not remember specifically his method for pre-
paring for Moskal-Kanz' testimony, which had occurred
many years prior to the habeas trial—and thus could
not rule out the possibility that he relied on his experi-
ence and cross-examined Moskal-Kanz without help
from an expert, as he did in some cases—does not
overcome the strong presumption of constitutionally
effective counsel. As the United States Court of Appeals
for the Second Circuit has observed, "[t]ime inevitably
fogs the memory of busy attorneys. That inevitability
does not reverse the *Strickland* presumption of effec-
tive performance. Without evidence establishing that
counsel's strategy arose from the vagaries of ignorance,
inattention or ineptitude . . . *Strickland*'s strong pre-
sumption must stand." (Citation omitted; internal quota-
tion marks omitted.) *Greiner* v. *Wells*, 417 F.3d 305, 326
(2d Cir. 2005), cert. denied sub nom. *Wells* v. *Ercole*,
546 U.S. 1184, 126 S. Ct. 1363, 164 L. Ed. 2d 72 (2006).
Accordingly, the petitioner's claim that Moscowitz per-
formed deficiently because he failed to consult an
expert witness must fail.

We also agree with the habeas court that the peti-
tioner failed to meet his burden of establishing that
Moscowitz performed deficiently by failing to present
testimony from an expert witness at the petitioner's
criminal trial in order to refute Moskal-Kanz' testimony.
Although Canter testified at the habeas trial that her
examination of the victim's colposcopic photographs
showed no signs of abnormalities, there are no findings
in the habeas court's memorandum of decision that,

prior to trial, Moscowitz knew about an expert who, like Canter, disagreed with Moskal-Kanz' opinion.

To the contrary, the habeas court credited Moscowitz' testimony that, had he consulted with a medical expert who believed that the victim's hymen was "normal," he would have either called that expert as a witness at trial or used the information to cross-examine Moskal-Kanz. This finding, together with the fact that Moscowitz did not call, or otherwise use the information provided by, an expert to refute Moskal-Kanz' testimony regarding the results of the victim's colposcopic examination, leads us to the conclusion that Moscowitz had not encountered such an expert prior to the petitioner's criminal trial. Although Moscowitz could have undertaken a search in hopes of finding such an expert, the constitution does not require trial lawyers to "track down each and every lead or personally investigate every evidentiary possibility before choosing a defense and developing it." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 683. Moscowitz testified that his strategy for confronting Moskal-Kanz instead was to establish the possibility that the trauma to the victim's hymen could have been caused by something other than penile penetration; we cannot second-guess that strategy here. Accordingly, the habeas court properly rejected this ineffective assistance claim.

## II

The petitioner next claims that the court improperly determined that he failed to prove that Moscowitz performed deficiently by failing to present the testimony of Strugar, the petitioner's neurosurgeon who performed back surgery on the petitioner in August, 1999, to establish that he was incapable of physically or sexually abusing the victim. We are not persuaded.

Regarding the failure to call allegedly exculpatory witnesses, "counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation and without adequate explanation, failed to call the witness at trial." (Internal quotation marks omitted.) *Ampero* v. *Commissioner of Correction*, 171 Conn. App. 670, 685, 157 A.3d 1192 (2017). Our cases recognize that a habeas court cannot second-guess counsel's decision not to call certain witnesses or pursue potential defenses when he "learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . ." *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681–82; see, e.g., *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 79, 967 A.2d 41 (2009) (counsel not deficient when decision not to call witness "was entirely consistent with . . . theory of defense"); *Thompson* v. *Commissioner of Correction*, 131 Conn. App. 671, 694–96,

27 A.3d 86 (decision not to interview and present two witnesses did not render pretrial investigation inadequate because counsel determined that testimony would have been unhelpful to theory of defense), cert. denied, 303 Conn. 902, 31 A.3d 1177 (2011); see also *Strickland* v. *Washington*, supra, 466 U.S. 691 ("when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable").

In the present case, the habeas court found that Moscowitz had discussed the potential defense of physical incapability with the petitioner but concluded that, in light of other facts known to him, such a defense "would not have been helpful as the [jury] was not likely to believe it."[6] The habeas court credited Moscowitz' testimony that, despite any diminished physical capability, the petitioner was not incapacitated or bedridden during the relevant time period, but, indeed, was sufficiently ambulatory to go out and search for drugs with the victim's mother.[7] The habeas court also credited Moscowitz' testimony that the petitioner's purported physical incapacity was not an adequate defense to the charged crimes because it did not account for other evidence that the state was going to present, such as that the petitioner frequently woke the children during the night to rub his back. The theory of defense at trial was instead that the victim fabricated the assaults to avoid being returned to her mother's care. As such, Moscowitz reasonably could have concluded that evidence regarding the petitioner's surgery and subsequent recovery plainly would not have been helpful to that theory of defense. Accordingly, the habeas court properly concluded that the petitioner had failed to rebut the presumption that Moscowitz' decision not to pursue the defense of physical incapacity by calling Strugar as a witness was based on reasonable professional judgment. See *Thompson* v. *Commissioner of Correction*, supra, 131 Conn. App. 691–92.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom her identity may be ascertained. See General Statutes § 54-86e.

[2] "The victim's mother was employed at night." *State* v. *Williams*, 102 Conn. App. 168, 171 n.3, 926 A.2d 7, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007).

[3] "A colored drawing by the victim depicting the [petitioner] on top of her in a bed and the [petitioner's] penis in her vagina was placed into evidence. The victim was depicted crying, and the [petitioner] was shown with a smirk on his face." *State* v. *Williams*, 102 Conn. App. 168, 171 n.4, 926 A.2d 7, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007).

[4] We also note that, to the extent that the habeas court's memorandum of decision is ambiguous regarding whether it found that Moscowitz had not consulted with an expert witness, the petitioner failed to move for an articulation pursuant to Practice Book § 66-5.

[5] At oral argument before this court, the petitioner argued for the first time that the court's failure to find specifically that Moscowitz did not consult a medical expert about the subject of Moskal-Kanz' testimony was

clearly erroneous. We disagree. Moscowitz testified at the habeas trial that he consulted with expert witnesses in "practically every case" in which the state presented medical evidence of trauma, but that he could not remember specifically if he did so in the petitioner's case. There was no other affirmative evidence presented that the petitioner did not consult an expert. Therefore, to the extent the habeas court found that the petitioner failed to prove that Moscowitz did not consult an expert, that finding is supported by the record and, therefore, is not clearly erroneous. See *State* v. *Gutierrez*, 132 Conn. App. 233, 239, 31 A.3d 412 (2011) ("[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" [internal quotation marks omitted]).

[6] The habeas court's memorandum of decision provides in relevant part: "[Moscowitz] testified [at the habeas trial] that he and the petitioner discussed the petitioner's back surgery in the course of trial preparation as well as the petitioner's theory that he was not physically capable of committing the assaults based on his back problems. [Moscowitz] specifically testified that the petitioner's preferred theory of defense would be severely damaged at trial based on potential evidence that the petitioner would wake the children up in the nighttime hours to rub his back. [Moscowitz] aptly described this potential evidence as 'not good.' [Moscowitz] further testified to the weakness of this potential defense theory based on evidence that the petitioner was not bedridden at all, instead being sufficiently ambulatory to be out looking for drugs with the victim's mother during the relevant time period. Based on the foregoing, [Moscowitz] reached the conclusion that evidence suggesting that the petitioner was physically incapable of committing the offense[s] would not have been helpful as the [jury] was not likely to believe it."

[7] The proposition that the petitioner lacked the physical capability of committing the charged crimes was especially dubious in light of Strugar's testimony at the habeas trial. He testified that the petitioner was a "large muscular person" of around 271 pounds. He further testified that, following his surgery in August, 1999, the petitioner experienced six to eight weeks of "relative incapacity" that included pain and stiffness, lifting restrictions, and limited range of motion. Strugar further testified, however, that, by early September, 1999, the petitioner's pain had "decreased remarkably." The habeas court credited Strugar's testimony that, at that time, he recommended that the petitioner "get . . . out of bed" and start "exercising his muscles." The habeas court further found that records from a September 27, 1999 visit indicated that the petitioner was "healing appropriately." Strugar also testified that, in October, 1999, there was "no objective reason" why the petitioner could not lift 120 pounds, and that the petitioner had "excellent strength in the legs" and could walk for two or three blocks before having to rest. Finally, Strugar testified that the petitioner's arms "were never an issue. They were always strong."